Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

**Dated: May 20th, 2018**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

| IN RE:<br><br>TERRY KEVIN HUFF and<br>PATRICIA SHERRY LEA HUFF,<br><br>Debtors. | CASE NO. 17-20290<br><br>CHAPTER 13<br><br><br>JUDGE FRANK W. VOLK |
|---|---|

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Confirmation of Debtors' Chapter 13 Plan [Dckt. 13] (the "Plan") and the objection by 21st Mortgage Corporation ("21st"). [Dckt. 25] (the "Objection"). The Plan included a Motion to Value Secured Property (the "Motion to Value"). On January 25, 2018, the Court heard the Motion to Value, during which time testimony and exhibits were presented by both parties in interest. At the conclusion of the hearing, the Court took the matter under advisement.

The Court enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as made applicable by Fed. R. Bankr. P. 7052.

**I.**

Based upon consideration of the evidence admitted at the hearing, the Court makes the following findings of fact by a preponderance evidence:

1. The Debtors became indebted to 21st on or about December 1, 2007, pursuant to an Installment Contract, Security Agreement, and a Deed of Trust (the "Loan"). *Proof of Claim no. 1-1*.

2. The indebtedness was secured by a Note and accompanying Deed of Trust on the property of the Debtors located at 1156 Randy Allen West Highway, Delbarton, WV 25670 (the "Land"). Additionally, the indebtedness was secured by placing a lien on the Certificate of Title of a 2006 Clayton Mobile Home, Serial No. CLH031946TNAB (the "Home"). The Land and the Home are collectively referred to as the "Collateral." *Proof of Claim no. 1-1*.

3. The original principal amount of the indebtedness was $59,123.10. The repayment terms were as follows: 240 monthly payments of $700.86. *Proof of Claim no. 1-1*.

4. The Debtors' filed a Chapter 13 petition on May 24, 2017.

5. The Debtors' defaulted on the Loan in June of 2017. *Proof of Claim no. 1-1*.

6. 21st filed a Proof of Claim (no. 1-1) on June 14, 2017, listing the secured indebtedness as $50,437.31 and arrearages of $4,859.48. *Proof of Claim no. 1-1*.

7. Debtors' filed their Plan on June 6, 2017, which purported to value the Collateral at $30,000. (Dckt. 13).

8. 21st filed the Objection to the Plan on June 28, 2017. (Dckt. 25).

9. The Court held an evidentiary hearing on the Plan and the Objection on January 25, 2018. 21st tendered its appraisal as Exhibit 1 ("21st's Appraisal") and called Robert Keck, an appraiser, as a witness.

10. 21st's Appraisal valued the home, separate from the land, at $44,500. The appraiser testified that the home was in good condition, and he made upward adjustments of value from the base price of $36,500. These adjustments took into account several components and accessories, including a deck and crown molding. *See* Exh. 1, pg. 2.

11. Additionally, 21st called Millard Ellis, a real estate agent, to value the land. Mr. Ellis testified that the value of the land was $10,000.00. This valuation opinion was based off his supporting Broker Price Opinion ("BPO," admitted into evidence as Exhibit 2).

12. Debtors' counsel objected to Mr. Ellis being qualified as an expert because he was not a certified appraiser.

13. 21st valued the Collateral at $54,500.00.

14. Debtors' counsel tendered his appraisal as Exhibit A ("Debtors' Appraisal"). Debtors' counsel called Eddie Estep to the stand. Mr. Estep valued the home, separate from the land, at $16,000.00.

15. Mr. Estep based his valuation on several components, including substandard underpinning and windows, holes in the siding, leaking bathroom faucets, and unstable decking, among other deficiencies.

16. Mr. Estep valued the land at $4,000.00. He based his valuation off of comparable land in the Delbarton area.

17. Accordingly, Debtors' valued the Collateral at $20,000.00.

18. Mr. Huff also testified as a lay witness about the condition of the Collateral.

## II.

**A.    Governing Standard**

This is a core proceeding pursuant to 28 U.S.C. § 157, as the matter arises under 11 U.S.C. §§ 506(a) and 1325(a)(5)(B). The Court is vested with subject jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

In the Plan, the Debtors are attempting to use the "cramdown" provision of § 1325(a)(5)(B). In order to do so, the

> (ii) value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
>
> (iii) if –
>
> > (I) Property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
> >
> > (II) the holder of such claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to

3

> provide to the holder of such claim adequate protection during the period of the plan . . .

11 U.S.C. §§ 1325(a)(b)(B)(ii) – (iii) (2012). The question of value is addressed in 11 U.S.C. § 506(a), which states that

> (1) [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
>
> (2) If the Debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing.  With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. §§ 506(a)(1)-(2) (2012).  Prior to the passage of BAPCPA, the term "replacement value," undefined in the Bankruptcy Code, was given meaning by the Supreme Court in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997).  Replacement value was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  *Id.* at 960.  So, when a debtor attempted to "cram down" a secured creditor under § 1325(a)(5)(B), "the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same proposed . . . use."  *Id.* at 965.

Following the enactment of § 506(a)(2) in 2005 as a part of BAPCPA, bankruptcy courts struggled with calculation of "retail value," or the value a retail merchant would charge.  In the quest to assign a number to that value in any case, a Court must hear and evaluate testimony in accordance with the qualification and credibility of expert witnesses.  *In re Prewitt*, No. 15-

4

60222, 2015 Bankr. LEXIS 4124, at *15 (Bankr. E.D. Tex. Dec. 8, 2015) (*citing In re Wright*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011); *In re Grind Coffee & Nosh, LLC*, 2011 Bankr. LEXIS 1335, at *6 (Bankr. S.D. Miss. Apr. 4, 2011)).

Often multiple appraisers provide conflicting valuations, and "[w]hen two appraisal reports conflict, a court must determine the value based on the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning." *In re 3G Props., LLC*, No. 10-04763-8-JRL, 2011 Bankr. LEXIS 4634, at * 20-21 (Bankr. E.D.N.C. July 12, 2011) (*quoting In re Sailboat Props., LLC*, No. 10-03718-8-SWH, 2011 Bankr. LEXIS 1316, at *17 (E.D.N.C. Mar. 31, 2011)). Several factors have emerged to assist courts in weighing conflicting appraisal testimony. Those factors include: the appraiser's education, training, experience, familiarity with the subject of the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. *Prewitt*, at *15 (*quoting Anderson v. Mega Lift Sys., LLC (In re Mega Systems, LLC)*, 2007 Bankr. LEXIS 1957, at *8 (Bankr. E.D. Tex., June 4, 2007)); *In re Smith*, 267 B.R. 568, 573-73 (Bankr. S.D. Ohio 2001). However, it is important to note that a court need not wholly accept the value of one appraiser over another – it can arrive at its own conclusion as to value based on its own interpretation of the evidence. *In re Breakwater Shores Partners, L.P.*, No. 10-61254, 2012 Bankr. LEXIS 1454, at *33 (Bankr. E.D. Tex. Apr. 5, 2012) (*citing in re Holcomb Health Care Servs., LLC*, 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004)); *see generally Sailboat Props.*, 2011 Bankr. LEXIS 1316.

And, if valuation testimony is provided by a property owner, that testimony is admissible, "but to sway the Court it must be persuasive." *In re Tucker*, No. 12-05872-HB, 2013 Bankr. LEXIS, at * 9 (Bankr. D.S.C. Jan. 25, 2013).

5

**B.     Analysis**

Debtors' appraiser, Mr. Estep, based his valuation on the cost approach method, relying mainly on the National Automobile Dealers Association ("NADA") database. The cost approach method is an appraisal technique where a fair valuation for property is calculated by establishing a "replacement value" for the property using a NADA report, and then adjusting the valuation according to the manufactured home's age, location, condition, and components found inside. *In re Jude,* No. 15-10330, 2016 Bankr. LEXIS 2387 (U.S. Bankr. E.D. Ky. June 24, 2016). The cost approach method is well accepted as a means to value mobile homes in this state. *Lee Trace LLC v. Raynes*, 751 S.E.2d 703 (W. Va. 2013).

The Court finds Mr. Estep to be a qualified appraiser. He is a licensed and certified residential real estate appraiser with a number of years of experience. Mr. Estep testified that he had valued several mobile homes in the past four to five years. Mr. Estep also described how he arrived at the value of $20,000 for the Collateral. First, Mr. Estep testified to inspecting the home. He found it to be of "fair" quality and a "bare-bones" home. Additionally, he detailed some of the extensive damage that he found in the home, including impaired countertops in the kitchen, damage to the carpet, signs of mold, and broken window seals. He stated that the decking was "unstable" and that he did not walk on it because he was afraid it would collapse.

Moreover, Mr. Estep noted that the siding was damaged and that issues existed respecting deteriorating gutters. These concerns influenced Mr. Estep to conclude that the home was constructed from substandard materials, qualifying it for the "fair condition" label. The Court notes that during cross examination Mr. Estep admitted that he did not input the home's specific tradename in the NADA database worksheet.

Next, Mr. Estep testified to the condition of the land. Mr. Estep personally walked the land to conduct his valuation. He indicated that the legal description of the land was .34 acres. He noted that the land was rough and littered with solid waste. Importantly, the land did not have its own septic system, and the size of the land was too small to install a private septic system. Mr. Estep utilized recent and comparably sized property in the Delbarton area to value the land at $4,000. Accordingly, Mr. Estep valued the Collateral at $20,000. The Court finds persuasive Mr. Estep's testimony regarding the extensive damage to the Collateral.

As a lay witness, Mr. Huff testified to extensive damage suffered by the home. He noted that the underpinning was severely damaged, the deck had cinderblocks holding it up, the plumbing leaked, and the countertops and faucets needed replaced. Mr. Estep testified that the home would sell for $15,000.

21st's appraiser, Mr. Keck, is also deemed qualified. Mr. Keck has been conducting appraisals since 2013, and he worked for Clayton Homes for 30 years. Mr. Keck personally inspected the home in order to ascertain its condition. He concluded that the home was in "good condition." On cross examination, however, Mr. Keck testified that the base price of the home was $32,316 and that he made upward adjustments of over $11,000 to reach his final valuation of $44,500. In the Court's estimation, that observation diminished Mr. Keck's credibility.

Next, Mr. Ellis testified on behalf of 21st as to the value of the land. Debtors' counsel objected to Mr. Ellis being identified as an expert witness because he was not a certified appraiser. The Court qualified Mr. Ellis by technical knowledge. Mr. Ellis did not personally enter the property. He drove by and took photographs. He valued the land at $10,000, believing it was composed of one acre. However, on cross examination, Mr. Ellis was made aware that the land was only 0.34 acre. Mr. Ellis testified that he believed it was one acre originally because the bank

had sent a prior appraisal indicating that it was one acre. Moreover, Mr. Ellis noted that he could not find the property because the road was re-named. Mr. Ellis used a 19 acre property and a one acre, flat property to reach the $10,000 valuation. The Court does not find persuasive Mr. Ellis's testimony regarding the valuation of the land.

A review of the exhibits and the testimony leads ineluctably to a finding that the Collateral is properly valued at $28,000. The appraisal price should be adjusted to account for the extensive damage that was evident in the home. Additionally, the size, location, and terrain of land, along with the lack of a septic system, evidenced by Mr. Estep's testimony was persuasive. Accordingly, by a preponderance of the evidence, this Court finds the value of the Collateral to be $28,000.

C.  **Conclusion**

Based on the evidence adduced, and for the reasons set forth herein, the Court finds the valuation provided by Debtor's Appraisal and Mr. Keck's testimony persuasive. Accordingly, the Court finds that the value of the Collateral is $28,000. Thus, the Debtors' Chapter 13 Plan does not stand in a confirmable posture at this time. Accordingly, it is **ORDERED** that the Collateral is worth $28,000 for the purposes of plan confirmation.

**IT IS FURTHER ORDERED** that Confirmation of the Debtors' Chapter 13 Plan is **DENIED** [Dckt. 13]. The Debtors are instructed to file an amended plan within 60 days of entry of this Order.